IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

**UNITED STATES OF AMERICA,**

        **Plaintiff,**

**v.**                                        **CR No. 07-0041 LH**

**STEPHEN TRAIN,**

        **Defendant.**

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant's Motion to Suppress Evidence Obtained From Illegal Search (Docket No. 25). The primary issue is whether the police officers constitutionally searched an apartment that Defendant Stephen Train occupied with his girlfriend. The Court, having considered the briefs and arguments of the parties and relevant caselaw, as well as evidence presented at a hearing on May 30, 2007, concludes that this motion is well taken and shall be **granted.**

**Procedural Standards**

Rule 12(d) of the Federal Rules of Criminal Procedure requires the Court to state its essential findings on the record when deciding a motion that involves factual issues. The findings of fact in this Memorandum Opinion and Order shall serve as the Court's essential findings for purposes of Rule

12(d). The Court makes these findings under the authority of Rule 104(a) of the Federal Rules of Evidence, which requires a judge to decide preliminary questions relating to the admissibility of evidence, including the legality of a search or seizure, and the voluntariness of an individual's confession or consent to search. *See United States v. Merritt*, 695 F.2d 1263, 1269 (10th Cir. 1982). In deciding such preliminary questions, the other rules of evidence, except those with respect to privileges, do not bind the Court. *See* FED.R.EVID. 1101(d)(1). Thus, the Court may consider hearsay in ruling on a motion to suppress. *See United States v. Merritt*, 695 F.2d at 1269.

**Law Regarding Validity of Warrantless Searches**

The Fourth Amendment to the United States Constitution provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, support by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. As the Supreme Court of the United States has made clear, "[t]he Fourth Amendment generally prohibits the warrantless entry of a person's home, whether to make an arrest or to search for specific objects." *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990)(*citations omitted*). "It is well settled under the Fourth and Fourteenth Amendments that a search conducted without a warrant issued upon probable cause is 'per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions.' " *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)(*citations omitted*). When a government agent enters a home without a warrant, "the burden is on the government to demonstrate exigent circumstances that overcome the presumption of unreasonableness that attaches to all warrantless home entries." *Welsh v. Wisconsin*, 466 U.S. 740,

750 (1984).  A determination as to whether or not exigent circumstances exist "ultimately depends on the unique facts of [the] controversy." *Id.*  The circumstances should be evaluated as they would have appeared to prudent, cautious, and trained officers. *United States v. Anderson*, 154 F.3d 1225, 1233 (10th Cir. 1998).

**Findings of Fact**

The Court makes the following factual findings:

On November 16, 2006, in response to a "911" call, Albuquerque Police Officers Simmons and Pettit went to an Albuquerque apartment ("the apartment") located at 1033 Madeira, S.E., Apartment 103.  They arrived at the apartment about 2 p.m.  Defendant Stephen Train and Heather Ellzey occupied this apartment together in a boyfriend/girlfriend relationship.  The "911" call had been made by Danielle O'Neill, a friend of Ms. Ellzey's, who was concerned about the safety of Ms. Ellzey.  As heard on the recording of the "911" call at the hearing, Ms. O'Neill stated that she had just seen Defendant act in a violent manner, yelling and screaming.  Ms. O'Neill knew that Ms. Ellzey was in the apartment with Defendant, and that Defendant had been in possession of a firearm at a party, one or two nights earlier.

Upon arrival at the apartment complex, the officers proceeded to the door of Apartment 103.  While outside the apartment, they heard muted screams and crying coming from within the apartment.  Officer Simmons knocked on the door, which was opened by Ms. Ellzey, who was holding her jaw, which was red and swollen.  Ms. Ellzey came outside the apartment.  Officer Simmons could see a man, whom she later learned was Defendant Stephen Train, to be standing in the hallway.  Officer Simmons drew her firearm, pointed it in a downward position toward Defendant, and told him to put

3

his hands on his head for officer safety. Officer Simmons directed Mr. Train to turn around and to back out of the apartment toward her. When he was immediately outside the front doorway of the apartment, he was patted down for weapons and placed in handcuffs. Officer Simmons testified that at that time, Defendant was detained for safety reasons, but that he was not arrested.

At the hearing, counsel for the Government stipulated to the fact that, while standing outside the door of the apartment in handcuffs, Defendant stated something to the effect of "you are not allowed to go in there – do you understand?" to the officers. Government counsel stated that this directive from Defendant is audible on the belt tape worn by Officer Simmons (Exhibit 1). Officer Simmons testified that at this juncture, Defendant was irate and stated either "this is our apartment" or "this is my apartment." Officer Pettit testified that Defendant indicated to him that he could not go inside the apartment – "something to the effect that you can't go inside."

Shortly after this statement from Defendant, Officer Pettit performed a protective sweep of the apartment, which he stated was done to ensure officer safety. No other persons were found inside the apartment.

At some point subsequently, Defendant was placed in the squad car. Ms. Ellzey went inside the apartment. Although she did not specifically tell Officer Simmons that she could come inside, Officer Simmons followed Ms. Ellzey into the apartment. During a subsequent interview by Officer Simmons in the apartment, Ms. Ellzey described Defendant's assault on her that day, as well as Defendant's threats to kill her family. Ms. Ellzey said that Defendant had been her boyfriend for several years. Officer Simmons understood from Ms. Ellzey, prior to the ensuing search, that

4

Defendant lived in the apartment sporadically, but that he was not on the lease.[1] Ms. Ellzey showed Officer Simmons the lease for the apartment, which had only Ms. Ellzey's name on it. She told Officer Simmons that Defendant did not pay rent. Officer Simmons testified that she did not think that she needed a search warrant, because it was Ms. Ellzey's apartment. Officer Simmons asked Ms. Ellzey for permission to search the apartment, which was given. Ms. Ellzey signed a Consent to Search Form. Officer Simmons asked where Defendant's firearm was located. Ms. Ellzey told her that it was in the bedroom under the mattress.[2]

At approximately 3:06 p.m., Officer Werley arrived and retrieved the firearm. Officer Pettit, who had escorted Defendant to the squad car, testified that he was unsure as to exactly where Defendant was, at the time that Ms. Ellzey signed the Permission to Search Form, or at the time that Officer Werley seized the firearm. Ms. Ellzey told Officer Simmons that she did not want the gun in her home and that she was afraid Defendant would come back for it.

Officer Simmons testified that she considered Defendant to be under arrest, at the conclusion of her interview of Ms. Ellzey.

The Court finds that all of the witnesses were credible in their testimony at the May 30, 2007 hearing.

**Analysis of *Georgia v. Randolph* ("the *Randolph* case")**

---

[1] Ms. Ellzey later testified that she had lived with Defendant for about 2.5 years; that he lived in the apartment; and that all of his belongings were in the apartment.

[2] When later queried by the Court, Ms. Ellzey said that she had seen the firearm on the day that Defendant was arrested. She stated that she did not know where Defendant hid the gun, except that she knew it was in the bedroom. She stated that she told Officer Simmons that there was a gun, and that it was in the bedroom.

5

Defendant objects to the entry into, and search of, the apartment. The primary focus of his motion is that the "search was illegal and all evidence obtained from that search must be suppressed." (Motion at 11). The Court will only address this particular police action, i.e., the search.[3]

The Supreme Court recently reviewed the constitutionality of a search in a case similar to this one. Specifically, in *Georgia v. Randolph*, 126 S.Ct. 1515 (2006), the Supreme Court considered the issue of whether one occupant may give law enforcement effective consent to search shared premises, as against a co-occupant who is present at the scene and expressly states a refusal to permit the search. The *Randolph* Court answered this question negatively, holding that a physically present co-occupant's stated refusal to permit entry renders the warrantless entry and search unreasonable and invalid as to him. Said another way, the Court held that a warrantless search of a shared dwelling for evidence over the express refusal of consent by a physically present resident cannot be justified as reasonable as to him on the basis of consent given to the police by another resident. *Id*. at 1526. Defendant argues that "[t]his case is virtually indistinguishable from *Randolph* and warrants the same outcome." (Motion at 1).

In order for the analysis in the *Randolph* case to apply, Defendant must have been a co-occupant or co-tenant of the apartment. Prior to conducting the search for the firearm, Officer Simmons understood from her interview of Ms. Ellzey that Defendant lived in the apartment, "sporadically" while Ms. Ellzey testified that Defendant lived in the apartment, that all of his belongings were in the apartment, and that they had lived together, not necessarily in this particular apartment, for approximately 2.5 years.

---

[3] Because Defendant does not specifically challenge the constitutionality of Officer Pettit's protective sweep of the apartment (which yielded no other evidence), the Court will not address the legality of this particular police action, nor will it address the other uninvited entries into the apartment by police officers.

6

It is unnecessary for the Court to resolve this discrepancy in the evidence, because, even if Defendant lived only "sporadically" in the apartment, he would be considered an occupant, for the purpose of this analysis under *Randolph*. In discussing the reasonableness of police entry in reliance on consent by one occupant subject to immediate challenge by another, at page 1522 the *Randolph* case cited *Minnesota v. Olson*, 495 U.S. 91 (1990). That case held that even overnight houseguests have a legitimate expectation of privacy in their temporary quarters. *Id*. at 99.

It is clear that Defendant was physically present at the threshold of the apartment and that his refusal to permit entry was unequivocal. Pursuant to *Randolph*, these combined facts render the warrantless search unreasonable and invalid as to him. In light of these facts, Defendant's express refusal of consent cannot be justified as reasonable as to him on the basis of consent given to the police by another resident. *Georgia v. Randolph*, 126 S.Ct. at 1526.

**This Case Cannot be Distinguished from the *Randolph* Case**

In its brief, the Government offers several arguments to the effect that the *Randolph* case does not apply to this case. The first argument is that there is no objective evidence that the Defendant told the officers not to enter the apartment. At the hearing, Government counsel conceded this argument, and as stated above, agreed to stipulate to the fact that, while standing outside the door of the apartment in handcuffs, Defendant stated something to the effect of "you are not allowed to go in there – do you understand?" to the officers.

The Government next argues that *Randolph* is distinguishable from this case in several respects. First, the Government argues that Defendant did not refuse to *consent* to a police search, but rather, he refused to grant *entry* into the apartment. The Court is not persuaded by this argument,

7

because entry is clearly a prerequisite to a search, and Defendant expressly stated that the police could not enter the apartment.

Next, the Government argues that Defendant was not physically present to refuse consent to search at the time the police asked Ms. Ellzey for her consent. The Court has carefully read the *Randolph* opinion, which discusses this topic, characterized as a "second loose end." *Id.* at 1527. Specifically, the Court discussed two prior cases wherein defendants were not present with the opportunity to object to a search. In *United States v. Matlock*, 415 U.S. 164 (1974), the defendant was not present with the opportunity to object, he was in a squad car not far away. Unlike in this case, prior to the search, the *Matlock* defendant had not been at the doorway, refusing to agree to entry of the police. In *Illinois v. Rodriguez*, 497 U.S. 177 (1990), defendant was actually asleep in the apartment, and the police might have roused him with a knock on the door before they entered with only the consent of an apparent co-tenant. In each case, a co-tenant gave permission for a search, and the legality of the search was upheld.

In admitting that the Court was "drawing a fine line," the Court declined to undercut *Matlock* and *Rodriguez*, by drawing these distinctions: "[I]f a potential defendant with self-interest in objecting is in fact at the door and objects, the co-tenant's permission does not suffice for a reasonable search, whereas the potential objector, nearby but not invited to take part in the threshold colloquy, loses out." *Georgia v. Randolph*, 126 S.Ct. at 1527. The Supreme Court went on to discuss the "practical value in the simple clarity of complementary rules, one recognizing the co-tenant's permission when there is no fellow occupant on hand, the other according dispositive weight to the fellow occupant's contrary indication when he expresses it." *Id.* Here, I conclude that Mr. Train expressed a refusal to permit entry into the apartment, which is tantamount to stating a refusal

8

to consent to a search. The fact that Mr. Train was detained by the police in a squad car at the time that Ms. Ellzey subsequently consented to a search of the apartment does not operate to cancel out his statement to the officers at the doorway of the apartment to the effect of "you are not allowed to go in there – do you understand?" His refusal to grant permission must be accorded "dispositive weight." *Id*.

None of these attempts by the Government to distinguish this case from the *Randolph* case has merit.

**Domestic Violence Exception**

The Government argues that, even if *Randolph* is applicable to this case, the police were fully justified in entering the apartment under the "domestic violence" exception carved out by the Supreme Court in *Randolph*. In other words, the Government contends that Defendant's protestations are ineffectual to prevent a search of the apartment, because this was a domestic violence situation.

It is crucial to examine exactly what the *Randolph* Court held in this regard. On page 1525, the Court first noted the law's general partiality toward

> "police action taken under a warrant as against searches and seizures without one," *United States v. Ventresca*, 380 U.S. 102, 107 . . . (1965); "the informed and deliberate determinations of magistrates empowered to issue warrants as to what searches and seizures are permissible under the Constitution are to be preferred over the hurried action of officers," *United States v. Lefkowitz*, 285 U.S. 452, 464 . . . (1932).

The Court stated that this established policy of Fourth Amendment law should not be undermined by the principal dissent's claim that it shields spousal abusers and other violent co-tenants who will

9

refuse to allow the police to enter a dwelling when their victims ask the police for help. The majority opinion went on to state that it recognized that domestic abuse is a serious problem in the United States, cited relevant reports and statistics, and then stated, "[b]ut this case has no bearing on the capacity of the police to protect domestic victims." The Court noted that

> [n]o question has been raised, or reasonably could be, about the authority of the police to enter a dwelling to protect a resident from domestic violence; so long as they have good reason to believe such a threat exists, it would be silly to suggest that the police would commit a tort by entering, say, to give a complaining tenant the opportunity to collect belongings and get out safely, or to determine whether violence (or threat of violence) has just occurred or is about to (or soon will) occur, however much a spouse or other co-tenant objected. (And since the police would then be lawfully in the premises, there is no question that they could seize any evidence in plain view or take further action support by any consequent probable cause, (*citation omitted*). Thus, the question whether the police might lawfully enter over objection in order to provide any protection that might be reasonable is easily answered yes. . . . **The undoubted right of the police to enter in order to protect a victim, however, has nothing to do with the question in this case, whether a search with the consent of one co-tenant is good against another, standing at the door and expressly refusing consent.**

*Georgia v. Randolph*, 126 S.Ct. at 1525-26 (*emphasis added*).

The last quoted sentence sums up the situation before the Court. As stated above, the Court expressly declines to rule on the legality of Officer Pettit's protective sweep or of Officer Simmons's uninvited entry into the apartment. What the motion currently before the Court deals with, rather, is whether Ms. Ellzey's consent to search is good against Mr. Train, who stood at the door and expressly refused permission to enter the apartment, which as stated above, is tantamount to refusing consent to search the apartment.

The issue before the Court cannot reasonably be construed as a question involving victim safety. By the time Officer Werley arrived to retrieve the firearm from the bedroom, approximately one hour and six minutes after the police had initially arrived at the scene, Defendant was handcuffed

10

and physically separated from Ms. Ellzey, who was being interviewed by Officer Simmons. Any risk of immediate harm had been extinguished once Defendant was placed in police custody, well before the search ensued. The Tenth Circuit has confirmed that an officer's warrantless entry of a residence during a domestic call is not exempt from the requirement of demonstrating exigent circumstances. *See United States v. Davis*, 290 F.3d 1239, 1244 (10th Cir. 2002). The Government has failed to demonstrate any sort of exigency, arising from the fact that this was a domestic violence call.

For these reasons, the Court concludes that, contrary to the position of the Government, the search was not justified under any domestic violence exception to the warrant requirement, as that exception was defined in the *Randolph* case.

**Regular Exigent Circumstances Analysis**

The Government's final alternative argument is that exigent circumstances justify the warrantless entry into the apartment. Exigent circumstances may exist when there is a "plausible claim of specially pressing or urgent law enforcement need," *llinois v. McArthur*, 531 U.S. 326, 331 (2001), for example the imminent destruction of evidence, *see Georgia v. Randolph*, 126 S.Ct. 1515 n.6 (2006). "Obviously, officers may not simply recite urgent needs without factual support. Otherwise the exception swallows the rule." *Cortez v. McCauley*, 478 F.3d 1108, 1123 (10th Cir. 2007). Exigent circumstances in an emergency situation exist when: (1) the law enforcement officers have objectively reasonable grounds to believe that there is an immediate need to protect their lives or others, and (2) "the manner and scope of the search is reasonable." *United States v. Najar*, 451 F.3d 710, 718 (10th Cir. 2006).

In this section of its brief (Response to Deft's Mot. at 15-19), the Government asserts that

11

the officers had an objectively reasonable basis to believe that there was an immediate need to protect the lives and safety of themselves or others (*Id*. at 16).  As stated above, the protective sweep by Officer Pettit and the uninvited entry into the apartment by Officer Simmons resulted in the discovery of no evidence, and these actions have not been directly challenged by Defendant.  The Court will not perform an exigent circumstance type analysis as to these two police actions.  Insofar as the subsequent search, however, as explained above, Defendant was handcuffed, outside the apartment, and may have been in the squad car at the time of the search.  The Court concludes that there was no potential danger to the officers or to Ms. Ellzey, sufficient to justify the search under the exigent circumstances exception.  The Government does not claim that the search should be upheld under the rubric of exigent circumstances, owing to some apprehension by the police officers that Mr. Train would remove the firearm from the apartment, before any warrant could be obtained.

**Conclusion**

The Court concludes that this search should not have been conducted without a warrant. As far as the record reveals, the officers might easily have secured the premises and sought a warrant permitting them to search.  *See Illinois v. McArthur*, 531 U.S. 326 (2001).

Stephen Train's refusal is clear, and nothing in the record justifies the search on grounds independent of Ms. Ellzey's consent.  Under *Randolph*, a physically present inhabitant's express refusal of consent to a government search serves to trump the consent of a fellow co-occupant. Because Mr. Train refused to allow the police to search his home, absent some exigent circumstance, the search was unreasonable under the Fourth Amendment, despite the fact that a co-occupant consented to the search.

The United States has failed to meet its burden of demonstrating that the search of the apartment falls under one of the exceptions to a warrantless search. The United States' own evidence demonstrates that a physically present co-occupant, the Defendant, expressly stated that the police officers were not to go into the apartment, which absent some exception to the analysis of *Randolph*, renders the warrantless search unreasonable and invalid as to Defendant. Furthermore, the United States has not shown that this search falls within any of the carefully defined set of exceptions. The "totality of the circumstances" present here do not suffice to justify abandoning the Fourth Amendment's traditional hostility to police search of a home without a warrant. The Court will suppress any physical evidence obtained from the illegal search, and any evidence derived therefrom. *See Wong Sun v. United States*, 371 U.S. 471, 485 (1963).

**IT IS ORDERED** that Defendant's Motion to Suppress Evidence Obtained From Illegal Search (Docket No. 25) is granted.

_____
**SENIOR UNITED STATES DISTRICT JUDGE**